**Gilberto LOPEZ, Petitioner,**

v.

**Harold J. SMITH, Superintendent, Attica Correctional Facility and Robert Abrams, Attorney General of the State of New York, Respondents.**

No. 80 Civ. 5593.

United States District Court,
S. D. New York.

June 12, 1981.

Manuel Nelson Zapata, New York City, for petitioner.

Mario Merola, Dist. Atty., Bronx County, New York City, for defendants; Robert Lefevre, Asst. Dist. Atty., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

Petitioner, now serving an indeterminate term of imprisonment of 15 years to life, following a guilty verdict by a jury of murder in the second degree [1] seeks to void his conviction by this federal writ of habeas corpus pursuant to 28 U.S.C. § 2254 by reason of alleged violation of his federal constitutional rights. The essence of his claim is that the judgment of conviction is void in that alleged prosecutorial conduct, the trial court's conduct, and its instructions to the jury deprived him of a fair trial. However, this Court's power to review the state court conviction requires a showing that the claimed constitutional infirmities were first presented to the state courts and all available state remedies were exhausted.[2]

The only showing made on this petition is that an appeal was taken to the Appellate Division which affirmed the judgment of conviction; that the New York State Court of Appeals denied leave to appeal, and that the Supreme Court of the United States denied certiorari. Nothing has been presented to indicate that petitioner's claims in this Court of violation of his federally protected rights were ever presented for consideration by the state courts.

■ The parties have not addressed themselves to this issue but, evidently relying upon the fact that there was state appellate review, allege that state remedies were exhausted. They have not submitted the briefs containing their respective contentions in urging reversal or affirmance of the judgment of conviction. Despite repeated admonitions [3] to the State Attorney General and county prosecutors of the importance of the exhaustion requirement, the matter appears not to have attracted their attention. The requirement that a petitioner exhaust state remedies is not a technical matter nor an idle ceremony. It reflects a policy of federal-state comity to afford a state the initial opportunity to pass upon and correct alleged violations of a defendant's constitutional rights "to avoid the unnecessary friction between the federal and state court systems that would result if a lower federal court upset a state court conviction without first giving the state court system an opportunity to correct its own constitutional errors." [4] However, since this Court in considering petitioner's contentions has necessarily [5] made a careful word-by-word study of the trial record and sentencing minutes of more than 700 pages, it is desirable to dispose of petitioner's contentions upon the merits. In this circumstance, the policy of federal-state comity would not be offended, particularly since the state itself has not raised the issue. Moreover, the interests of judicial economy would be served. To deny petitioner's application without prejudice to a renewal, forecasts a state proceeding where, if petitioner did not prevail, a second habeas corpus petition would most likely be filed in this Court.

In the instant case, the fact determination the jury was called upon to decide was comparatively simple. Petitioner and his friend Rafael Sanchez, who were in a bodega in the Bronx, New York, got into a heated argument about the return of $5 that Sanchez owed to petitioner and which Sanchez refused to return while he was engaged in a card game. Apparently there were some fisticuffs and the parties were separated by bystanders. After the altercation, petitioner left the scene and shortly

---

1. N.Y.S.Penal Law § 125.25.

2. 28 U.S.C. § 2254(b) & (c). *Picard v. Connor*, 404 U.S. 270, 275–76, 92 S.Ct. 509, 512–513, 30 L.Ed.2d 438 (1971).

3. *Cf. Sams v. Warden*, 507 F.Supp. 141 (S.D.N.Y.1981); *Reese v. Bara*, 479 F.Supp. 651 (S.D.N.Y.1979).

4. *Preiser v. Rodriquez*, 411 U.S. 475, 490, 93 S.Ct. 1827, 1836, 36 L.Ed.2d 439 (1973); *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Fay v. Noia*, 372 U.S. 391, 419–20, 83 S.Ct. 822, 838–839, 9 L.Ed.2d 837 (1963); *United States ex rel. Aloi v. Arnold*, 413 F.Supp. 1384 (S.D.N.Y.1976).

5. *See Jackson v. Virginia*, 443 U.S. 307, 324, 99 S.Ct. 2781, 2792, 61 L.Ed.2d 560 (1979).

thereafter returned to a social club next door to the bodega where Sanchez then was. The People offered evidence through eyewitnesses that petitioner approached Sanchez, who was seated with his head resting on a pool table, stated "I'm going to kill you," fired a pistol and, when Sanchez jumped up, petitioner fired a second time, striking Sanchez in the chest. Sanchez died soon thereafter. Other witnesses, who were outside the club and heard the shooting, offered circumstantial evidence that Lopez left the premises immediately after the shooting.

Several hours later, petitioner was apprehended at the adjacent apartment of his neighbor, where he had been with his wife and children after earlier having gone to his own apartment where he showered and changed his clothes. Advised of his constitutional rights, he made a statement to the arresting officer and later to an assistant district attorney. In substance, he stated that Sanchez and he had argued and later fought at the club because of the five dollar debt; that Sanchez made a movement to take something out of his left side belt, whereupon he jumped on Sanchez because the latter threatened to kill him and his nine-year old daughter; he also stated that he never saw a weapon because others present grabbed him and took him outside. He returned to his home, changed his clothes, and went to a next door neighbor's because he feared some action by Sanchez's brothers. The weapon from which the bullets were discharged was never found upon the club premises or any other place.

The petitioner testified at his trial, substantially repeating his version that Sanchez threatened him; that he grabbed Sanchez, and "kind of hugged him" and encircled him with his hands around his waistline.[6] Then "two shots sounded," and Sanchez fell to the floor, but petitioner didn't know he was hurt. The two shots came "from the struggle we were having." He denied he had a gun in his possession at that time or any other time or that he ever

owned a gun. He further testified that while he didn't see a gun on Sanchez, they struggled because he "tried to take it out." Thus there was a sharp issue of fact—who had the gun and what caused the two shots to go off.

With petitioner's testimony sharply contradicted by eyewitness testimony that he fired the two shots, it is not without interest to note that counsel who represented petitioner at his sentencing and who is his attorney on this application, said of petitioner's trial counsel that "he fell into the error of permitting the defendant, a man he was sworn to represent, to take the stand and tell a story that did not represent the truth."[7] To this may be added that the review of this record suggests petitioner's version of the shooting incident sounds implausible.

Against the background of trial testimony, we turn to petitioner's contentions. The claim of prosecutorial unfairness centers about matters of evidence, some of which are of such an inconsequential nature as to suggest they are frivolous.

As this Court noted on a previous occasion:

Each state is free to adopt its own procedures and rules of evidence in the enforcement of its criminal laws, and these may not be interfered with by the federal courts unless they offend fundamental principles of justice and fair play. It follows that mere errors or mistakes of law committed in the conduct of state criminal trials may not be reviewed by the federal courts; they are empowered to upset a state court judgment of conviction only when the wrong complained of necessarily denied the defendant a fair trial—in short, that the judgment of conviction is void for lack of due process because of the state's "failure to observe that fundamental fairness essential to the very concept of justice." Absent such a showing, the writ of habeas corpus is not

---

**6.** Tr. at 513.

**7.** Tr. at 11.

available to review errors in petitioner's trial in the admission of evidence.[8]

■ First, petitioner complains about the prosecutor's cross-examination of Vincent Reyes, who was called as a witness by petitioner, and his comment upon the witness' testimony. Reyes gave testimony that tended to corroborate petitioner's version that Sanchez was the aggressor; that Sanchez walked over to petitioner with his right hand on his left waist; that he then saw Lopez's arm around Sanchez's waist; that suddenly there were two detonations, one after the other, and that Sanchez fell down; that there was general commotion and everybody in the social club started to swing, going wild.[9] All Reyes could testify to was that the two shots came from the two men, but that it was Sanchez who fell down; he did not say which man fired the shots. This witness had a rather extensive record of criminal convictions, as to which his memory had to be prodded. Reyes was also questioned, without objection, as to whether he had received money from either defense counsel or defendant's wife, which he denied. His credibility obviously was properly subject to attack. Moreover, the failure to object forecloses any claim as to this item.[10]

■ Most of the witnesses were friends of both petitioner and the deceased. Roger Maldonado, called by the People, was such a witness and testified he knew them both. However, defendant's counsel developed on cross-examination that the witness was a "good friend" of the deceased whereupon the prosecution, quite properly, upon redirect questioned the witness as to whether he was also a friend of petitioner, to which he volunteered, "Up until the day he killed my friend." The defense motion to strike was granted. The prosecution then questioned the witness to establish that prior to the date of the homicide he was a friend of petitioner, and followed this up by asking was he a friend after that date to which he responded that he was not. The defense counsel's motion to strike the latter answer was granted. The follow-up questioning does not justify a claim of prosecutorial misconduct, since defense counsel initiated the entire issue by his questioning of the witness which was limited to the witness' friendship for the decedent, with its suggestion that thereby he was biased in favor of decedent and prejudiced against the petitioner.

■ The next error which is claimed to have infringed upon defendant's constitutional right to a fair trial is based upon the cross-examination of defendant's reputation witness, his employer. The questioning of this witness, rather inartfully, veered from his knowledge of the reputation of petitioner[11] to, in some respects, his opinion as to petitioner's character.[12] The prosecution, on cross-examination, asked the witness if he would change his opinion if petitioner had shot somebody in cold blood, to which the witness responded he would if he "found . . . the facts as you describe them." Since the witness in the main was questioned as to petitioner's reputation for peacefulness, quiet and integrity, it may be that the prosecutor's question should not have been allowed, but under the circumstances of petitioner's counsel's freewheeling questioning of the witness, it was not error to allow the attempt to impeach his opinion[13]—and even if it were deemed er-

8. *United States ex rel. Birch v. Fay*, 190 F.Supp. 105, 107 (S.D.N.Y.1961) (quoting *Lisenba v. State of Calif.*, 314 U.S. 219, 236, 62 S.Ct. 280, 290, 86 L.Ed. 166 (1941)).

9. Tr. at 433–36.

10. *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976); *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

11. *Cf. Michelson v. United States*, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed.2d 168 (1948).

12. *See* Fed.R.Evid. 405(a), in effect in the federal courts.

13. *Cf. United States v. Morgan*, 554 F.2d 31, 33 (2d Cir. 1977).

ror, in the light of the record, it is harmless beyond a reasonable doubt.[14]

■ Finally, petitioner contends that actions of the trial court deprived him of a fair trial. First, he relies upon the court's comments, as a result of his counsel's call, in the presence of the jury, for the production of certain garments worn by the deceased which it is urged foreclosed a fair trial. The claim is so utterly lacking in substance that one is surprised that it is raised. The contention must be viewed against the background of events that preceded the incident relied upon. On the previous day, at a robing room conference, petitioner's counsel, who had the duty to, but had failed to, subpoena the desired material raised the question of their production. The prosecutor stated that he was not sure if the garments were in the possession of the coroner or the police department or had been returned to the family of the deceased. Although critical of defense counsel's failure to have taken action for the production of the garments, the prosecutor stated that he would do everything to assure they would be in the courtroom if they could be located to afford counsel the

opportunity to make whatever use of them he desired. The prosecutor later advised the court and counsel that despite the efforts of the detective in charge, having made "every effort to be cooperative with the defense in production of these garments," they had not been located.[15] The trial went over to the following day due to defendant's illness and when it resumed, after first putting petitioner on the stand, his counsel stated in the presence of the jury, "If your Honor pleases, I call for the production of the four garments testified to by Dr. Hyland [the medical examiner]." In the light of what previously had transpired in the robing room, this statement can only be described as histrionic and posturing before the jury. The prosecutor understandably expressed his outrage and chided defense counsel for not living up to his duty to have exerted efforts for almost a year to obtain their production. Thereupon the court made a reference to the in-chamber, off-the-record discussion of the previous day and in the light of the heated statements by counsel, made the statements set forth in the margin.[16]

14. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

15. Tr. at 478.

16. THE COURT: Well, counsel I recall you having made that request, since you brought it up at this point, out of the presence of the jury. I have requested Mr. Poppe [the Assistant District Attorney] to make every effort to obtain those garments if they are available and he had the last time, to my information, he had advised me that he was making every effort to obtain them and as yet he hasn't been able to obtain them.

Now, excuse me—now, at this point you have raised it in front of the jury, counsel. I think it is very improper application. You have complete subpoena power. If there are any documents or any garments, as you refer to them, that are required for the purpose of the trial you have a perfect right to subpoena them if they are available. Again, I asked Mr. Poppe to make effort to procure them for your use in order to expedite this matter but you had perfect right to subpoena them.

MR. POPPE: Let me state for the record—

THE COURT: The responsibility for the people is not to produce them.

MR. POPPE: Detective Drummond has spend yesterday making phone calls. He has called the M.E.'s office and—

MR. SOKOL: I am going to object to that.

THE COURT: No, I will hear Mr. Poppe. You raised it, counsel.

MR. POPPE: We have been unable to locate those garments. Police Officer McDonagh has attempted to locate those garments and has been unable to locate those garments. Judge, we have done everything we possible can to find those garments for counsel.

THE COURT: Well, I don't see that it is the responsibility of the People to produce the garments.

MR. POPPE: I most respectfully agree.

THE COURT: As I indicated previously, we will request Mr. Poppe to cooperate as best that he could to obtain them since this trial is in process and wanted to expedite it as best we could, but the fact is there is no obligation upon the people to produce them. It is your obligation, if you needed them, to subpoena them.

MR. SOKOL: There was no report this morning to your Honor by Mr. Poppe concerning any further efforts on his part before court opened or as soon as your Honor took the bench.

The court's comments to the jury were entirely justified and in any event, furnish no basis for a claim of denial or deprivation of a fair trial.

■ Finally, petitioner claims that two statements, clearly inadvertent, made by the trial court during the course of its instructions to the jury deprived him of a fair trial. The insubstantiality of this claim is readily established by the failure of petitioner's counsel to take an exception. The court, in what clearly was a slip of the tongue, stated "the best evidence of the charges against the defendant" is the indictment, when it is apparent that it meant to state that the indictment was the best "statement" of the charge. Apart from the fact that it went unnoticed by defense counsel, who took no exception or failed to call the court's attention to the matter, the court had earlier given an entirely correct and unexceptionable instruction on the nature of the indictment, that it constituted no proof and that the sole burden of proof of establishing guilt beyond a reasonable doubt was upon the prosecution.[17]

Another inadvertent statement was made by the court when it said that if the jury did not believe the People had established their case beyond a reasonable doubt, it must convict. The Assistant District Attorney noticed the misstatement and upon the conclusion of the charge called it to the court's attention, and the appropriate correction was thereupon made without exception and with the acquiescence of defense counsel. This leaves no room to doubt that the incidents were of no material consequence.

The Court has considered each and every contention made by petitioner and finds that neither singly nor in totality do they furnish the basis for a claim that the defendant was denied his right to a fundamentally fair trial.

The petition is dismissed. So ordered.

THE COURT: Counsel, you had no right to raise that question at this time knowing the background of this application and knowing what procedure would be under the circumstances. However, you have raised it. The application is denied.

Tr. at 487–89.

17. Tr. at 645.